**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**LAURIE JO ARBAUGH,**

     **Plaintiff,**

**vs.**                  **CIVIL ACTION NO. 2:17-CV-01878**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered March 14, 2017 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the Plaintiff's Memorandum in Support of Judgment on the Pleadings and the Defendant's Brief in Support of Defendant's Decision. (Document Nos. 10 and 11.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 10.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 11.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket.

## Procedural History

The Plaintiff, Laurie Jo Arbaugh (hereinafter referred to as "Claimant"), filed her application for Title II benefits on January 10, 2014 alleging disability since December 16, 2012 due to tendonitis, herniated disc in neck, spurs in back, plates and screws in neck, pins and screws in right leg, arthritis in right shoulder, and mild depression. (Tr. at 155-156, 173.) Her claim was initially denied on March 7, 2014 (Tr. at 91-95.) and again upon reconsideration on May 7, 2014. (Tr. at 97-103.) Thereafter, Claimant filed a written request for hearing on May 29, 2014. (Tr. at 104-105.) An administrative hearing was held on January 5, 2016 before the Honorable John T. Molleur, Administrative Law Judge ("ALJ"). (Tr. at 33-66.) On February 3, 2016, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 16-32.) On March 18, 2016, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 14-15.) The ALJ's decision became the final decision of the Commissioner on January 13, 2017 when the Appeals Council denied Claimant's Request. (Tr. at 1-6.)

On March 14, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 7 and 8.) Subsequently, Claimant filed a Memorandum in Support of Motion for Judgment on the Pleadings (Document No. 10.) in response, the Commissioner filed a Brief in Support of Defendant's Decision (Document No. 11.), and then Claimant filed her Reply. (Document No. 12.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was born in June 1960 and considered a "person closely approaching advanced age" in the beginning of the relevant period, but prior to the ALJ's decision, Claimant changed age

categories to a "person of advanced age". <u>See</u> 20 C.F.R. §§ 404.1563(d) and (e). (Tr. at 170.) Claimant has a high school education, a certificate in auto mechanics, and previously worked as a restaurant cashier and in food preparation, housekeeping, and telemarketing. (Tr. at 42-45, 175.)

**<u>Standard</u>**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. <u>See</u> <u>Blalock v. Richardson</u>, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. <u>Id</u>. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. <u>Id</u>. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. <u>Id</u>. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. <u>Id</u>. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. <u>Id</u>. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. <u>Id</u>. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age,

education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None,

one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## **Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the insured status requirements on June 30, 2015. (Tr. at 21, Finding No. 1.) The ALJ next determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of December 16, 2012 through her date last insured ("DLI") June 30, 2015. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: cervical degenerative disc disease status post fusion; and degenerative joint disease of the right shoulder. (Id., Finding No. 3.) At step three, the ALJ concluded that the severity of Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 24, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work except

> she is able to climb ladders, ropes, and scaffolds occasionally. She is able to climb stairs and ramps, balance, stoop, kneel, crouch, and crawl frequently. She is able to push and pull with the dominant right upper extremity occasionally. She is able to reach overhead with the dominant right upper extremity occasionally. She is able to reach in all other directions with the dominant right upper extremity frequently. The claimant is limited to occasional exposure to extreme cold and vibration. She is limited to occasional forceful gripping and twisting with the right hand, as well as frequent handling and fingering with the right hand. The claimant is limited to independently lift and carry only 10 pounds with the right hand.

(Id., Finding No. 5.) At step four, the ALJ found Claimant was capable of performing her past relevant work through her DLI as a cashier and that this work did not require the performance of work-related activities precluded by her RFC. (Tr. at 27, Finding No. 6.) Finally, the ALJ determined that Claimant had not been under a disability at any time from December 16, 2012

through June 30, 2015. (<u>Id</u>., Finding No. 7.)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

Claimant's appeal is based on her contention that the ALJ failed to consider all the medical evidence of record in making his decision, specifically, medical records documenting Claimant's functional limitations in her right shoulder and cervical spine. (Document No. 10 at 5-6.) Claimant argues that the ALJ did not consider the physical therapy records submitted after the hearing because of inconsistent statements made in the written decision; ultimately, the ALJ's failure to properly consider this evidence undermined the credibility finding, the RFC assessment, and ultimately, the denial of benefits. (<u>Id</u>. at 6-7.) Claimant compares her case to <u>Meadows v. Colvin</u>, No. 1:14-cv-15147, 2015 WL 3820609, (S.D.W. Va. June 18, 2015), where this Court found reversible error by an ALJ who failed to consider the claimant's cardiac impairment that could have made a major difference in the RFC finding. (<u>Id</u>. at 7.) For these reasons, Claimant asks this case reversed and remanded for an award of benefits, or alternatively, for remand in order that the Commissioner may correct the errors below. (<u>Id</u>. at 8.)

In response, the Commissioner asserts that Claimant did not prove she was disabled at any time between December 16, 2012 through June 30, 2015 and argues that the post-DLI physical therapy records did not demonstrate she had any functional limitations before June 30, 2015. (Document No. 11 at 10-11.) Despite Claimant's contention otherwise, the Commissioner states that the ALJ expressly considered her physical therapy records submitted after the hearing and his statement that the record contained no physical therapy records appeared to be in reference to a treatment gap during the relevant period. (<u>Id</u>. at 11, fn5.) Nevertheless, the Commissioner argues that the records would not have changed the outcome of the decision, because at most, they

indicated that Claimant would have a diminished ability to reach onto high shelves and to engage in recreational activities, as opposed to work activities. (Id. at 12.) The ALJ accounted for these in the RFC, and Claimant offers no other suggestions. (Id. at 12-13.)

The Commissioner also argues that Claimant's reliance on Meadows v. Colvin is misplaced, because in the case *sub judice*, the evidence post-dated her DLI; moreover, Allen v. Colvin, Case No. 2:15-cv-04162, 2016 WL 1529692, at *16 (S.D.W. Va. March 18, 2016) is more on point where this district rejected the exact argument Claimant makes here. (Id. at 13.) Allen is distinguishable from Meadows insofar as the error was harmless where the ALJ did not discuss certain medical evidence because it did not indicate any change in the claimant's condition – the RFC finding would have been no different. (Id. at 14.)

The Commissioner adds that if this Court were to find that substantial evidence does not support the final decision, then remand for another hearing is appropriate, not an outright award of benefits. (Id. at 14-15.) However, the Commissioner asks that the final decision be affirmed. (Id. at 15.)

In reply, Claimant asserts that she has demonstrated that her post-DLI physical therapy records relate back to her pre-DLI impairments, and further, the ALJ's conflicting statements about having no physical therapy records in evidence was used to improperly discredit Claimant's testimony, as well as to assess and RFC without the support of substantial evidence. (Document No. 12 at 1-2.) The ALJ has a duty to explain his findings and conclusions to allow for judicial review, since that is absent here, remand is appropriate. (Id. at 2.)

## **The Relevant Evidence of Record**[2]

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

<u>Pre-DLI Medical Records:</u>

In April 2011, Claimant was involved in a minor car accident, and presented to the emergency room complaining of neck and right shoulder pain. (Tr. at 274.) On examination, she had some tenderness to palpation in the anterior right shoulder, but full range of motion, full motor strength, a normal gait, and no sensory motor deficits, swelling, or deformity. (Tr. at 275.) X-rays of her right shoulder were normal, and revealed no evidence of fracture or other bone pathology. (Tr. at 279.)

In November 2012, Claimant presented to Katrina Barnes, M.D. for a new patient examination. (Tr. at 232.) She reported that she not seen a physician for the past three years, but had a history of right shoulder issues beginning in 2005 when she was diagnosed with tendonitis, followed by surgery in 2007, and an injury in 2009 which resulted in the inability to reach all the way behind her back with her right arm. (<u>Id</u>.) Claimant also complained that two weeks earlier, she woke up and was not able to put her arm all the way down to her side, but explained that her shoulder did not hurt and that she was able to do her normal activities without any pain or other issue. (<u>Id</u>.) On examination, Claimant was in no distress; had no neck tenderness; no swelling in her extremities; and good shoulder range of motion without pain, but  Dr. Barnes noted that Claimant was unable to reach behind her lower back with her right arm, and that her right arm could not go completely against her side. (Tr. at 233.) Claimant was referred to physical therapy. (<u>Id</u>.) A January 2013 MRI of Claimant's right shoulder revealed mild AC joint osteoarthritis, mild distal supraspinatus tendinopathy without a rotator cuff tear, and glenohumoral joint osteoarthritis.

(Tr. at 248-249.)

Claimant was examined by John Henry, M.D. in February 2013. (Tr. at 228.) At that time, Claimant complained of right shoulder pain for the past three months. (Id.) On examination, she had no deformity or atrophy; no AC joint tenderness; full active range of motion in the shoulder; mildly positive impingement signs and mildly positive bicipital tenderness; intact strength to abduction and external rotation; and neurovascularly intact. (Tr. at 229-230.) Dr. Henry assessed Claimant with right shoulder osteoarthritis, and gave her a Depo-Medrol and Lidocaine injection in the right shoulder glenohumeral joint. (Tr. at 230.)

Claimant returned to Dr. Barnes in August 2013 and complained that her right shoulder and arm pain were worse and that she was unable to pick things up with her right arm. (Tr. at 238.) However, she reported that she was able to move her shoulder in all ranges without pain and had been keeping busy with sewing. (Tr. at 238-239.) On examination, Claimant had no edema; good range of motion in her right shoulder at rest but was restricted with adduction; had no pain in shoulder joint, but some pain with palpation at the medial posterior joint along the tricep; and normal strength in bicep and tricep. (Tr. at 240.) Dr. Barnes noted that although Claimant had a shoulder pathology based on the MRI, it did not seem to be causing any shoulder pain. (Id.)

Post-DLI Physical Therapy Records:

Claimant received physical therapy in August 2015 and September 2015. (Tr. at 297-364.) During her initial intake appointment on August 4, 2015, Claimant reported shoulder pain for 10 years, and indicated that she had a hard time using her right arm and was becoming accustomed to using her left hand for chores. (Tr. at 350.) She also reported some success with physical therapy three to four years earlier, but that she was still limited "some" in her range of motion. (Id.) She

rated her pain at a three or four on a 10-point scale. (Tr. at 351.) On examination, Claimant's right shoulder range of motion was within functional limits except that her internal rotation was limited to 60 degrees (70-90 is normal) and she had somewhat limited strength in her left shoulder (4-/5). (Tr. at 351-352.) The physical therapist noted that Claimant had limited range of motion, pain, decreased strength and muscular endurance, diminished ability to engage in recreational activities, and diminished ability to reach onto high shelves. (Tr. at 353.)

On August 12, 2015, Claimant reported that she was about the same, and rated her pain as a three on a 10-point scale. (Tr. at 325-326.) The therapist noted that her internal range of motion improved with a subscapularis release (Tr. at 327.) At her next therapy session, on August 17, 2015, Claimant reported that her shoulder pain was "about the same," but could not reach her bra strap. (Id.) She rated her pain at a two or three on a 10-point scale (Id.) On August 25, 2015, Claimant reported that she felt better after physical therapy, but the pain and stiffness eventually return. (Tr. at 329.) The therapist noted that Claimant had near normal right shoulder range of motion, but had decreased strength and ability to do home activities of daily living. (Tr. at 330.) On September 2, 2015, Claimant reported that her shoulder pain affected her activities and that it was more difficult to drive. (Tr. at 302, 307.) It was noted that Claimant continued to have diminished range of motion, pain, with decreased strength, muscular endurance, ability to sleep comfortably, ability to engage in recreational activities, and ability to reach onto high shelves. (Id.) On September 15, 2015, she reported that she only wanted to continue her home exercise program as nothing else has helped thus far. (Tr. at 309.) It was noted that her symptoms appeared to be cervical related and it was discussed that she might be having both cervical and shoulder related issues that she will have to discuss with her referring physician. (Id.) She was ultimately discharged

from therapy. (Id.)

<u>State Agency Medical Consultants:</u>

On March 3, 2014, at the initial level of review, Tarun Ray, M.D. reviewed the record and opined that Claimant could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel crouch and crawl; was limited in her ability to reach overhead with her right extremity, but had no other manipulative limitations; and should avoid concentrated exposure to hazards. (Tr. at 74.)

On May 2, 2014, at the reconsideration level, Narendra Parikshak, M.D. reviewed the records and affirmed Dr. Ray's RFC as written, explaining that there was no new medical evidence to suggest increased functional limitations. (Tr. at 85.)

<u>The Function Report and Pain Questionnaire:</u>

In an adult function report from February 2014, Claimant averred that she cares for her grandchildren, and takes them to school and pre-school every day. (Tr. at 182.) She also cares for her small dogs. (Id.) She can drive and ride in a car; go out alone; and shops in stores for food, household items, and pet food every week. (Tr. at 184.) Claimant often spends time with others, including meeting friends for lunch, and has no trouble getting along with family, friends, and neighbors. (Tr. at 185-186.) She reported that she can walk half a mile, and tries to walk more when the weather is nice. (Tr. at 186.) Claimant stated that she can follow written and spoken instructions "good" and handles stress "ok". (Tr. at 187.) She indicated that she does not use a brace, splint, or any other device for ambulation or stability. (Id.) In the pain questionnaire,

Claimant reported that rest, ice, hot showers, and over the counter pain medications help relieve her pain; although her pain is continuous and gets worse with any kind of movement. (Tr. at 189.)

**The Administrative Hearing**

Claimant Testimony:

With regard to her impairments, Claimant testified that she quit telemarketing work because she had difficulty sitting because of pressure in her mid-back almost down to her knees, and in her neck from the plates and screws. (Tr. at 46-48.) She stated that she also had pain in her right shoulder and that she had tried physical therapy and shots for her pain, but she never wanted to have shots again, however, nothing has helped. (Tr. at 49-50.) She reported that she could lift a gallon of milk with both hands, but was unable to reach her right arm above her shoulder. (Tr. at 50-51.) Claimant also reported that she had started taking nerve medication, which had increased her ability to walk more and mow the lawn, and that she had already lost five pounds as a result. (Tr. at 56.)

With regard to her activities, Claimant testified that she lives with her husband who works outside the home. (Tr. at 40.) She stated that she was able to cook, but that her husband has to help carry big pots of soup. (Tr. at 50.) Claimant can carry smaller pots and laundry baskets. (Id.)

For hobbies, Claimant does needlepoint and sewing, but stops when she is in pain. (Tr. at 51.) She mows the lawn using a self-propelled mower. (Tr. at 56.)

Cecelia Thomas, Vocational Expert ("VE") Testimony:

The VE characterized Claimant's past work as light and unskilled, none of which had transferable skills to other occupational areas. (Tr. at 57-58.) Given the hypothetical individual with Claimant's age, education and work background who is limited to light work, with occasional

climbing of ropes, ladders, and scaffolds, with other postural activities limited to frequent, with pushing and pulling and overhead reaching with the dominant right upper extremity limited to occasional, but reaching in all other directions limited to frequent, and no more than occasional exposure to extreme cold or vibrations, the VE testified that the individual could perform the past work, as a cashier. (Tr. at 58-59.) The VE also stated that the cashier job would still remain even if the individual was limited to only occasional forceful gripping or twisting with the right hand and frequent handling and fingering with the right hand. (Tr. at 59.) Even if the individual was limited to independently lift and carry only ten pounds with the right hand, the VE testified that the cashier job would remain, as significant lifting is not involved in those jobs, however, there may be volitional issues with the non-acceptance of a position that may require that. (Tr. at 59-60.)

However, if the individual was limited to only sedentary work, the VE testified that the past work would not be feasible; further, the VE stated that the past work and other work would not be available if the individual would be off task on average of 60-90 minutes in addition to regular breaks per day due to pain or fatigue. (Tr. at 61.)

When asked by Claimant's attorney if the hypothetical individual was further limited to occasional reaching in all directions with the right arm, the VE responded that the cashier job would still be feasible. (Tr. at 62.) The VE testified that the Dictionary of Occupational Titles ("DOT") does not differentiate between bilateral or dominate extremities for those limitations, however, in her opinion, the cashier job would still be feasible, although per the DOT, the reaching requirement for those jobs is frequent. (Tr. at 63.) Additionally, if the individual were limited to

only occasional fine and gross manipulations in the right hand, the VE testified that the cashier job would still be feasible for that individual. (Tr. at 64.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**Analysis**

The primary issue on appeal is whether the ALJ considered all the medical evidence pertaining to Claimant's cervical and shoulder impairments, specifically, the 70 pages of physical therapy records dated August 4, 2015 through September 2, 2015. (Tr. at 296-364.) At the administrative hearing, the ALJ advised Claimant and her attorney that because these records post-

dated her DLI, he was not going to hold the record open for them for that reason; however, he stated that he will consider those records for "historical purposes", insofar as to consider them from the context of the other evidence in the file. (Tr. at 64-65.) The ALJ expressly stated at the outset of his written decision that those records "were added to the record as Exhibit 5F and have been reviewed and considered in reaching this decision." (Tr. at 19.)

Duty to Develop the Evidence of Record

As Claimant pointed out in her brief, in Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant *when that evidence is inadequate*." Id. (emphasis added) The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that she is disabled. 20 C.F.R. § 404.1512(a) (stating that "in general, you have to prove to us that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s).") Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that she has an impairment. Id. § 404.1512(c). The Regulations provide that: "You must provide medical evidence showing that you

have an impairment(s) and how severe it is during the time you say that you are disabled." <u>Id</u>. The

Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

<u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987).

It is also important to keep in mind that although the ALJ has a duty to fully and fairly

develop the record, he is not required to act as a claimant's counsel. <u>Clark v. Shalala</u>, 28 F.3d 828,

830-831 (8th Cir. 1994). Claimant bears the burden of establishing a *prima facie* entitlement to

benefits. <u>See</u> <u>Hall v. Harris</u>, 658 F.2d 260, 264-265 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An

individual shall not be considered to be under a disability unless s/he furnishes such medical and

other evidence of the existence thereof as the Commissioner of Social Security may require.")

Similarly, he "bears the risk of non-persuasion." <u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056 (4th

Cir. 1976).

Beyond the single citation to the physical therapy records at the beginning of the written

decision, the ALJ did not reference them at all. Claimant contends that the ALJ did not consider

them, despite his express statement in the beginning that he did, because later on in the decision,

he states the following: "Additionally, the record contains no physical therapy records. This lack

of treatment reveals the claimant's shoulder impairment is not as severe as alleged and diminishes

her credibility, as well." (Tr. at 26.) Claimant asserts that the ALJ's conflicting statements were

then used to discount Claimant's credibility, and subsequently, flawed the RFC assessment. There is no dispute concerning the ALJ's finding that none of Claimant's impairments met or medically equaled the severity of one of the Listings. (Tr. at 24.)

If remand is necessary, then an ALJ's decision would have been based on inadequate evidence to support his conclusions. Cook v. Heckler, 783 F.2d at 1173. Clearly, the physical therapy records indicated Claimant continued to have problems with range of motion and pain, and Claimant testified about those issues, however, there was other objective and probative medical evidence the ALJ reviewed, as described *supra*. Even assuming the ALJ completely disregarded the evidence contained in Exhibit 5F, despite the assertion otherwise, the remaining evidence was not "inadequate" to support his determinations. Id. Indeed, it has been repeatedly recognized in this district that "an ALJ need not comment on every piece of evidence in the record." See, e.g., Cook v. Colvin, No. 2:13-cv-30155, 2015 WL 430880, at *17 (S.D.W. Va. Jan. 30, 2015).

Before the ALJ took testimony at the administrative hearing, Claimant's attorney represented to the ALJ that the file was not complete because Claimant continued to have treatment for her right shoulder with Dr. Bartsokas; she just submitted additional treatment notes dated July 27, 2015. (Tr. at 38.) The ALJ replied, "the right shoulder issues are pretty well documented in the file. We'll establish through testimony exactly what's been going on with Dr. Bartsokas, and then we'll figure out then, you know, if there's something we really need to see." (Tr. at 38-39.)

The undersigned agrees with the Commissioner that this case is less like Meadows v. Colvin,[3] and more like Allen v. Colvin,[4] because the ALJ's failure to discuss the physical therapy records would not have made a difference in the RFC assessment. (Document No. 11 at 13-14.) Just like in Allen, the ALJ herein did not fail to discuss key evidence from the relevant period pertaining to her shoulder and neck impairments. The ALJ reviewed the evidence regarding the treatment of Claimant's cervical spine as well as her right shoulder, which included a CT scan and an MRI, respectively, noting "[d]espite treatment, the claimant continues to complain of significant symptoms." (Tr. at 21-22.) The ALJ addressed Claimant's neck impairment, noting that she underwent a cervical fusion in 2007, that a CT scan in April 2011 "demonstrated normal alignment of the cervical vertebral segments", and that she had a prior anterior fusion at the C5 through C7 levels. (Tr. at 25.) Though the ALJ recognized Claimant testified about this prior treatment, and that she continues to have pain in her neck, he noted "there are no current complaints of neck pain in the available medical records as of the claimant's alleged onset date, despite visiting the doctor for other conditions numerous times." (Id.) Ultimately, the ALJ determined that "[i]t appears the cervical fusion was generally successful in relieving the claimant's symptoms." (Id.)

With respect to Claimant's right shoulder impairment, there was more evidence available for the ALJ's review. The ALJ noted that Claimant's primary healthcare provider, Katrina Barnes, M.D., diagnosed tendonitis in 2005, for which Claimant had surgery in 2007, but then received

---

[3] No. 1:14-cv-15147, 2015 WL 3820609 (S.D.W. Va. June 18, 2015). The Court found remand appropriate where the ALJ's RFC discussion minimized the seriousness of the claimant's cardiac disease and failed to acknowledge or discuss certain key evidence related to that condition, such as a treating physician's statements that the claimant suffered from disabling symptoms. Id. at *13-16. In addition, the ALJ's error compounded by relying on opinion evidence that predated significant medical findings limiting the claimant's ability to walk or stand. Id. at *16.
[4] No. 2:15-cv-04162, 2016 WL 1529692 (S.D.W. Va. March 18, 2016). The ALJ relied upon opinion evidence that considered the unmentioned medical evidence, which did not demonstrate a significant change in the claimant's knee condition, therefore the RFC assessment would not have been any different. Id. at *16.

another injury to her right shoulder in 2009. (Id.) The ALJ acknowledged that Claimant "reported she experiences significant pain in her right shoulder", that "she was unable to reach overhead with her right arm", and that Claimant advised her treating physician that "she remained unable to reach behind her back" or "to put her arm all the way down to her side unless she twisted her arm counterclockwise and then relaxed it down to her side." (Id.) This was reconciled with Dr. Barnes's finding "good range of motion without any pain" and although Claimant's arm "stuck out approximately 10 degrees, she indicated the claimant was able to pronate her hands or arm, which enabled her to relax completely down her side, but with an uncomfortable sensation." (Tr. at 25-26.) The MRI of Claimant's right shoulder indicated "mild" abnormalities without rotator cuff tear. (Tr. at 26.) Next, the ALJ reviewed the treatment records from John S. Henry, M.D., noting his specialty, orthopedics, as well as Claimant's reporting to him of continued shoulder pain at night. (Id.) The ALJ noted Dr. Henry's examination findings were mild, with intact strength to abduction and external rotation as well as to neurovascular systems, which also was consistent with the x-ray findings. (Id.)

Notably, the ALJ recognized two gaps in treatment for the right shoulder. The first being a six-month gap in 2013, where once again, Dr. Barnes's examination revealed mild findings, including "good range of motion" without pain in the right shoulder. (Id.) The second gap in treatment spanned two years, when Claimant reported to Dr. Barnes that physical therapy did not improve her right shoulder condition. (Id.) The ALJ then stated, "[a]dditionally, the record contains no physical therapy records." (Id.) The parties dispute what this sentence means: Claimant asserts that the ALJ did not consider the physical therapy records contained in Exhibit 5F; and the Commissioner asserts the ALJ appeared to be discussing a gap in treatment during the relevant

period. (Document No. 10 at 6; Document No. 11 at 11, fn5.) However, outside of speculating whether the ALJ considered these records or not, the fact remains that pursuant to <u>Cook v. Heckler</u> and its progeny, the ALJ had plenty of adequate evidence to render a decision. The ALJ expressly noted, after the arguably conflicting statement, that "other evidence of record fails to support the claimant's allegations", indeed, the decision references several of Claimant's statements and testimony regarding her activities of daily living which the ALJ found to be inconsistent with her allegations of totally disabling pain and symptoms.

The ALJ took note of all of the following: Claimant advised that she took her grandchildren to school (Tr. at 22, 26-27.); that she took care of her grandson (Tr. at 22, 27.); that she cared for small pet dogs (Tr. at 22.); that she had no problems with personal care (Tr. at 22, 27.); that she prepared meals daily, though she had her husband assist with lifting large pots of water (Tr. at 22, 25, 27.); that she cleaned her home and mowed the lawn (Tr. at 22-23, 27.); that she shopped in stores for groceries and household items weekly (Tr. at 23, 27.); that her hobbies included sewing and needlepoint, she reported to her treating physician that she "stayed busy with sewing", and though it takes her longer, she testified that she made baby quilts (Tr. at 23, 26, 27.); that she reported being able to lift a laundry basket (Tr. at 25.); that she reported being able to lift a gallon of milk with both hands (<u>Id</u>.); and that she reported to Dr. Barnes that "she was able to perform all of her normal activities without any pain or issues." (<u>Id</u>.)

It is important to recognize that Claimant post-dated DLI physical therapy records only concerned additional treatment in August and September 2015, and the ALJ had the benefit of Claimant's testimony in January 2016, which not only corroborated her complaints in the physical therapy records, but also with her complaints in the treatment records during the relevant period,

which pre-dated her DLI. Further, the ALJ noted Claimant's inability to reach overhead with her right arm, and in spite of his finding that Claimant's allegations were inconsistent with her treatment providers' examination findings, the ALJ stated "[t]o the extent that the claimant does report continued pain and imagining and examinations do show some deficits, the undersigned has restricted the claimant's ability to independently lift and carry, and to perform gross manipulations, with the affected upper extremity." (Tr. at 25, 26.) In short, the post-date DLI physical therapy records would not have reasonably changed the ALJ's determination, as they did not demonstrate any significant change in Claimant's impairments.

Contrary to Claimant's argument that the ALJ undermined her credibility solely on the basis that "the record contains no physical therapy records"; as described in detail *supra*, the ALJ noted "other evidence of record fails to support the claimant's allegations."[5] (Tr. at 26.) In addition, that "other evidence of record" was clearly reviewed, including Claimant's own statements, to craft the resulting RFC assessment. Ultimately, the ALJ found that Claimant was not credible to the extent that "they purport to describe a condition of disability for Social Security purposes", and that she was capable of performing the work related activities, namely, her past relevant work as a cashier, her right upper extremity notwithstanding. (Tr. at 27.)

Accordingly, the undersigned **FINDS** that remand is unnecessary in this case because the ALJ had more than adequate evidence to render his findings and conclusions under the jurisprudence of <u>Cook v. Heckler</u>. Moreover, in light of the aforementioned, the undersigned **FINDS** that the ALJ properly discounted Claimant's credibility and made an RFC assessment

---

[5] In addition to the aforementioned, the ALJ noted that Claimant "complained of back pain at the hearing. There is no evidence in the available medical records to indicate she ever complained of back pain to any of her health care providers. There is no evidence of any actual diagnosis or treatment for the claimant's alleged back pain." (Tr. at 23-24.)

based on the substantial evidence of record. In sum, the undersigned **FINDS** that the decision denying Claimant's application for disability benefits was based upon substantial evidence.

<u>**Recommendations for Disposition**</u>

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (Document No. 10.), **GRANT** the Defendant's request to affirm the decision (Document No. 11.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d

91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: August 31, 2017.

Omar J. Aboulhosn
United States Magistrate Judge